# In the United States Court of Federal Claims

No. 19-1160C
(Filed: October 10, 2019)
**\*Opinion originally filed under seal on October 7, 2019**

| | | |
|---|---|---|
| | ) | |
| AKIRA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Bid Protest; Motion to Dismiss for |
| | ) | Lack of Subject Matter Jurisdiction; |
| v. | ) | RCFC 12(b)(1); FASA; 41 U.S.C. |
| | ) | § 4106(f); Task Order Modification |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| CHAGS HEALTH INFORMATION | ) | |
| TECHNOLOGY, LLC | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

*Christopher R. Shipplett,* Falls Church, VA, for plaintiff.

*Daniel K. Greene,* Civil Division, United States Department of Justice, Washington, DC, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirshman, Jr.*, Director, and *Douglas K. Mickle*, Assistant Director, for defendant. *Robyn Littman,* Office of General Counsel, U.S. Dept. of Health and Human Services, Washington, DC, of counsel.

*David B. Dixon*, McLean, VA, for defendant-intervenor. *Robert C. Starling*, McLean, VA, of counsel.

## OPINION

**FIRESTONE,** *Senior Judge.*

This post-award bid protest has been brought by Akira Technologies, Inc. ("Akira") against the United States Centers for Medicare & Medicaid Services ("CMS").[1] At issue is CMS' Strategic Partners Acquisition Readiness Contract ("SPARC"). Tab 6 at Administrative Record ("AR") 1444; Tab 11 at AR 1481. SPARC is a multiple award Indefinite/Delivery Indefinite Quantity ("IDIQ") contract. Both Akira and Chags Health Information Technology, LLC ("C-HIT"), the defendant-intervenor, were awarded contracts under SPARC. Akira protests CMS' sole source decision to modify the task order awarded to C-HIT in June 2019 to include work that Akira had been performing under the IDIQ contract. Akira contends that CMS' decision to modify C-HIT's task order to include work that Akira had been performing without holding a competition among all of the IDIQ awardees was irrational and not in accordance with procurement law.

Pending before the court is the government's motion to dismiss Akira's complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") (ECF No. 35), Akira and the government's motions to supplement the administrative record (ECF Nos. 28, 33), the plaintiff's motion for a preliminary injunction (ECF No. 4), and the parties' cross-motions for judgment on the administrative record (ECF Nos. 30, 34, 35).

The government argues in its motion to dismiss that Akira's complaint is barred under the Federal Acquisition and Streamlining Act of 1994 ("FASA"), 41 U.S.C.

---

[1] CMS is the agency within the Department of Health and Human Services that is responsible for, among other things, administering Medicare.

§ 4106. Under FASA, this court does not have jurisdiction to hear protests "in connection with the issuance or proposed issuance of a task or delivery order except for . . . a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued." 41 U.S.C. § 4106(f)(1); 48 C.F.R. § 16.505(a)(10) (duplicating the FASA protest bar).[2] The government argues that the modification of C-HIT's task order falls within the bar set in 41 U.S.C. § 4106. The government further argues that this court does not have jurisdiction over Akira's claims because Akira has failed to demonstrate standing as "interested party." *Clinicomp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) ("First, [the protestor] must show that it is an 'interested party.'"). According to the government, because Akira failed to successfully perform the tasks transferred to C-HIT, Akira would not have been considered for the modification sole sourced to C-HIT in any case.

Because the court finds that this protest is barred by FASA, this court does not have subject matter jurisdiction over Akira's challenge to CMS' decision to obtain additional services from C-HIT through a task order modification. Accordingly, the government's motion to dismiss is **GRANTED**, and the remaining motions are **DENIED-AS-MOOT**.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

---

[2] 48 C.F.R. § 16.505(a)(10) provides that no protest "is authorized in connection with the issuance or proposed issuance of an order under a task-order contract or delivery-order contract, except (A) [a] protest on the grounds that it increases the scope, period, or maximum value of the contract."

3

### A.    The Contract and Initial Task Order Awards

CMS decided to modernize its systems by migrating its applications that utilize enterprise identity management from an on-premise data center to a cloud-based environment. Tab 5 at AR 1322; Tab 11 at AR 1479. In connection with this effort, CMS issued the Strategic Partners Acquisition Readiness Contract ("SPARC"). Tab 6 at AR 1444; Tab 11 at AR 1481. SPARC is a multiple award IDIQ contract. Both Akira and C-HIT were awarded contracts under SPARC and could compete for task orders.

Relevant to this protest, CMS awarded two task orders for Identity Management ("IDM") under SPARC: one to Akira and one to C-HIT. On September 9, 2017, CMS also awarded SPARC's maintenance task order to C-HIT. Tab 2 at AR 9. Under the maintenance task order, C-HIT is required to maintain CMS' old platform until all of its applications are migrated to the new platform, decommission the servers that host the old platform, and "support and perform all migration tasks, as required by CMS, to move application users and associated data, system configurations, functionality, etc. from the [old platform] to the [new platform] . . . ." Tab 2a at AR 96; *see also id.* at AR 120 ("[m]igration services, to move applications integrated with the EIDM [the old platform] to another CMS Identity Management (IDM) System [the new platform], is within the scope" of the maintenance task order), AR 175-76 § C.6 ("Application Migration Services"). At the time of award, the total cost of the maintenance task order was $43,495,333. Tab 2 at AR 20. This task order had a base period that ran from September 8, 2017 to September 7, 2018 and was followed by two one-year option periods, two six-

4

month option periods, a four-month option period, and a four-month transition-out

period. Tab 3 at AR 236-44.

On May 4, 2017, CMS issued its second solicitation for SPARC's migration task

order.[3] Tab 6 at AR 1444. The awardee of this task order would be responsible for taking

the lead on migrating CMS' applications to the new platform and would receive support

from C-HIT, pursuant to C-HIT's maintenance task order. Tab 5 at AR 1322-23; Tab 6 at

AR 1444. The awardee of the migration task order would be responsible for migrating

data, configuring the new platform, and addressing technical issues. *E.g.*, Tab 5 at AR

1345 ¶¶ 1-4, AR 1347 ¶¶ 9-11, AR 1350, AR 1415. Custom software needed to be

developed to accomplish these tasks. *E.g.*, Tab 5 at AR 1332 ¶¶ xii-iii ("CMS is seeking a

contractor having in place an Agile software development methodology . . . and able to

use this Agile methodology to . . . Effectively and efficiently migrate legacy applications

and databases into CMS' Okta IDaas and Saviynt IGAaas from EIDM" and "to

coordinate the transition from the EIDM/RIDP/MFA contractor to the new Experian

RIDP services contactor; and, Effectively and efficiently integrate new applications

seeking to utilize CMS' IDM services"), AR 1350 ("In support of IDM application

integrations or migration from other CMS IDM systems, the Contractor SHALL develop

---

[3] The first solicitation for the migration task order was a set-aside for the awardees of the IDIQ contract that were either Service Disabled Veteran Owned Small Businesses or Women-Owned Small Businesses. Tab 6 at AR 1444. That competition did not yield a successful offeror, and as a result, the competition was expanded to be a set-aside for all awardees of the IDIQ contract that are small businesses. *Id.*

the design for the architecture, software components/modules, interfaces and/or database changes or configurations required."), AR 1415 ("create software and source code").

After considering final proposal revisions, the agency awarded the migration task order to Akira on August 24, 2018. Tab 6 at AR 1457. This task order had a base period that ran from August 24, 2018 to August 23, 2019, and included three one-year option periods, a fourth option period of six months, and a six-month close-out period. Tab 5 at AR 1259-63. At the time of the award, the total cost of the migration task order was $26,127,509. Tab 5 at AR 1263.

### B. CMS' Decision Not To Exercise The Option Periods On Akira's Task Order And To Instead Modify C-HIT's Task Order To Cover The Migration Work

On May 3, 2019, CMS determined that it was in the government's best interest not to exercise the option years on Akira's migration task order and to instead secure the migration services Akira had been performing from another source. Tab 1 at AR 1-8; Tab 11 at AR 1479-82.[4] Rather than issue another task order, on June 21, 2019, CMS prepared a Justification and Approval ("J&A") to modify C-HIT's maintenance task order to include the migration services the agency needed. The work required by the modification is the same work that had been required by the migration task order. Tab 1 at AR 4-5; *accord* Am. Compl. ¶ 45 (alleging the agency improperly "mov[ed] Akira's work" to C-HIT).

---

[4] Akira disagrees with CMS' objections to its performance and CMS' decision not to exercise the option on Akira's task order. Those issues are not before the court.

The J&A sets forth in detail the contracting officer's rationale for relying on the exception for urgent agency needs so that the contracting officer did not have to "provide each awardee a fair opportunity to be considered." Tab 1 at AR 4-5; 48 C.F.R. § 16.505(b).[5] The J&A indicates that the contracting officer believed that if CMS were to conduct a competitive procurement for a task order, there would not be enough time for the work to be completed by the March 29, 2020 deadline set by CMS. Tab 1 at AR 4-5.

The contracting officer was aware that under CMS' guidelines it takes at least four months to compete a new task order. Tab 1 at AR 5; *accord* Tab 8 at AR 1468 ("IDIQ Competitive Orders" of less than $20 million). The contracting officer also factored in a transition period of three-to-four months in case the award was won by a bidder not familiar with the migration work that had been performed, Tab 1 at AR 5. This is consistent with the transition period stated in the migration task order. Tab 5 at AR 1404 (specifying a transition period of 120 or fewer days if work is taken over by another contractor). Based on these considerations, the contracting officer concluded that it would not be possible to meet the migration deadline of March 29, 2020. Tab 1 at AR 5.

The contracting officer also explained her reasons for selecting C-HIT to perform the migration work. *Id.* She explained that "C-HIT has maintained good performance on the [maintenance] task order" and is "already tasked with supporting the migration." *Id.* The contracting officer also noted that C-HIT had been next in line for the award of the

---

[5] 48 C.F.R. § 16.505(b) states that "[t]he contracting officer must provide each awardee a fair opportunity to be considered for each order exceeding $3,500." 48 C.F.R. § 16.505(b)(2)(i)(A) provides an exception that states when "[t]he agency need for the supplies or services is so urgent that providing a fair opportunity would result in unacceptable delays."

migration task order. *Id*. She further noted that C-HIT was already familiar with the migration work because C-HIT is the contractor for the "CMS Enterprise Portal," which will interface with the applications when they are migrated to the new platform. *Id.* The contracting officer concluded that C-HIT's "knowledge and experience puts [it] in the unique position" to be able to perform the migration work immediately. *Id.* On June 25, 2019, CMS modified C-HIT's maintenance task order, and C-HIT began the new migration work immediately. Tab 4u at AR 1159; Contracting Officer's Second Declaration (CO Second Decl.) ¶ 8. The J&A was posted to FedBizOpps on July 1, 2019. ECF No. 1-2 at 25.

The total estimated cost for the additional services to be performed by C- HIT is $9,842,042 broken down as follows: $1,585,885 for the work to be performed during option period 1 (which ran from September 8, 2019, to September 7, 2019) and $8,256,157 for the work to be performed during option period 2 (September 8, 2019, to September 7, 2020). Tab 1 at AR 2, AR 5-6.

### C.    Procedural History

On August 9, 2019, more than forty days after CMS modified C-HIT's task order, Akira filed the instant complaint. On the same day, Akira also filed its motion for a preliminary injunction and temporary restraining order. The court held a status conference on August 15, 2019. Thereafter, the court denied Akira's motion for a temporary restraining order and consolidated the plaintiff's motion for a preliminary injunction with the motions for judgment on the administrative record pursuant to RCFC 65(a)(2). (ECF No. 14). Akira amended its complaint on August 30, 2019. (ECF No. 27).

Briefing was complete on September 12, 2019 and the court held oral argument on September 17, 2019. During oral argument, the government referenced cases that were not identified in its briefs. The court requested supplemental briefing on the significance of the additional authority. (ECF No. 38). Supplemental briefing was completed on September 27, 2019.

## II.  MOTION TO DISMISS

### A.  Legal Standards

The standards upon which motions to dismiss for lack of subject matter jurisdiction can be granted in this court are well-settled. *McKuhn v. United States*, No. 18-107C, 2018 WL 2126909, at *2 (Fed. Cl. May 9, 2018). The plaintiff must establish the court's subject matter jurisdiction by a preponderance of the evidence. *Fid. & Guar. Ins. Underwriters, Inc. v. United States*, 805 F.3d 1082, 1087 (Fed. Cir. 2015) (citing *Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013)). "In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Estes Exp. Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014).

Before the court may turn to the merits of Akira's protest, the court must first "satisfy itself that it has jurisdiction to hear and decide a case." *Hardie v. United States*, 367 F.3d 1288, 1290 (Fed. Cir. 2004) (quoting *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed. Cir. 2002)); *see Remote Diagnostic Techs., LLC v. United States*, 133 Fed. Cl. 198, 202 (2017) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,

94 (1998)) ("Jurisdiction is a threshold matter that must be resolved before the Court can

take action on the merits.")).

This court ordinarily has jurisdiction under 28 U.S.C. § 1491(b)(1) to "render

judgment on an action by an interested party objecting to . . . any alleged violation of

statute or regulation in connection with a procurement or proposed procurement."

However, as noted at the outset, if the bar to review under FASA applies, this court may

not have jurisdiction. Specifically, this court does not have jurisdiction to hear protests

"in connection with the issuance or proposed issuance of a task or delivery order except

for . . . a protest on the ground that the order increases the scope, period, or maximum

value of the contract under which the order is issued." 41 U.S.C. § 4106(f)(1); 48 C.F.R.

§ 16.505(a)(10) (duplicating the FASA protest bar). The Federal Circuit has explained

that if the FASA bar applies "the court [has] no room to exercise jurisdiction" even "if

the protester points to an alleged violation of statute or regulation." *SRA Int'l, Inc. v.

United States*, 766 F.3d 1409, 1413 (Fed. Cir. 2014) (acknowledging that "this statute is

somewhat unusual in that it effectively eliminates all judicial review for protests made in

connection with a procurement designated as a task order").

Akira does not contend that the migration task order exceeds the scope of SPARC.

Therefore, FASA's exception for orders that "increase[] the scope, period, or maximum

value of the contract under which the order is issued" does not apply here.  Recognizing

that FASA therefore bars this court's review of any task orders awarded under SPARC,

Akira argues that it is not seeking review of a task order, but instead is seeking review of

a task order "modification." Akira then argues that the FASA bar does not address task

order "modifications" and thus does not preclude judicial review of the modification to

C-HIT's maintenance task order in this case. Pl.'s Reply at 4 (ECF No. 37).

The government argues that FASA's jurisdictional bar to this court's review of

task orders extends to task order "modifications." Def.'s Mot. to Dismiss ("Def.'s Mot.")

at 11. The government asserts that to hold that the court has jurisdiction to review task

order modifications for services related to a task order would contradict the intent of

FASA, "which was to streamline Federal contracting such that once IDIQ contracts were

awarded pursuant to full and open competition . . . agencies could then issue task orders

within the scope, period, and maximum value of those contracts without worrying about

delays due to protests." *Id.* at 13-14 (citing *A & D Fire Protection, Inc. v. United States*,

72 Fed. Cl. 126, 133 (2006); *LaBarge Prods., Inc.*, 2010 CPD ¶ 31, 2010 WL 182937, at

*2 (Comp. Gen. Jan. 19, 2010)). To find otherwise, the government argues, would elevate

form over substance, in contravention of FASA.

### B. Task Order Modifications That Do Not Increase The Scope, Period Of Performance Or Maximum Contract Value Are Barred From Review Under FASA

The court finds that the bar in FASA precludes this court's review of Akira's

protest. A protest of a task order modification to acquire additional services directly

connected to the services provided in a previously issued task order that does not

otherwise increase the scope, period or the maximum amount of the IDIQ contract is a

protest "in connection with the issuance of a task order," and thus is barred.

The court begins with the definition of "task order." The Federal Acquisition

Regulations ("FAR") define "task order" to include "an order for services placed against

an established contract." *See* 48 C.F.R. § 2.101. The FAR does not distinguish between new task orders or modifications of task orders. Indeed, the FAR regulates "[o]rders" generally, and those regulations apply equally to the issuance of task orders and task order modifications for additional services. *See* 48 C.F.R. § 16.505. Here, CMS has, through a modification to an existing task order, "ordered" additional services within the scope of an established IDIQ contract. The fact that CMS achieved its purpose by issuing a task order modification rather than by issuing a new task order is a distinction without a difference. Under the terms of the FAR, Akira's objection is plainly an objection to a task order.  For this reason, Akira's protest is barred under FASA.

Even if a task order "modification" for additional services is not a "task order," Akira's protest to the task order modification at issue in this case is a protest made "in connection with" the maintenance task order originally issued to C-HIT, and thus the protest is barred under the plain terms of FASA. 41 U.S.C. § 4106(f)(1). Akira's reliance on *Global Computer Enterprises, Inc. v. United States*, 88 Fed. Cl. 350 (2009), to nonetheless suggest that all task order modifications are subject to review in this court is misplaced. In *Global Computer*, the court determined that where a task order modification has no connection with an existing task order *and* is alleged to be outside the scope of the original contract, review of the task order modification is not barred by FASA. 88 Fed. Cl. at 413. Here, however, the record is clear that the modification to C-HIT's task order directly relates to C-HIT's original maintenance task order work, and Akira concedes that the modification does not increase the scope of the IDIQ contract. *See* Def.'s Mot. 14; Tab 1 at AR5; Tab 2a at AR 96, AR 120, AR 175-76. Indeed, the

12

contracting officer elected to sole source the migration work to C-HIT specifically because the migration work was related to C-HIT's maintenance task order. Tab 1 at AR 4-5.

The fact that CMS later ordered additional migration services through the task order modification does not defeat FASA's jurisdictional bar for protests made "in connection with" the issuance of a task order. The Federal Circuit has stated that "nothing in FASA's language automatically exempts actions that are temporally disconnected from the issuance of a task order." *SRA Int'l*, 766 F.3d at 1413 (finding that FASA barred a an OCI waiver made after the issuance of a task order because the waiver "was directly and causally connected to the issuance of" the task order).

Additionally, decisions following *Global Computer* have distinguished that case based on its unique facts and have affirmed the wide breadth of FASA's protest bar for any protest "in connection with" the issuance of a task or delivery order. For example, in *DataMill, Inc. v. United States*, 91 Fed. Cl. 740, 755-61 (2010), the protestor sought to circumvent FASA's bar on protests made in connection with delivery orders by conceptually protesting the Army's "*decision* to make a sole source award," separate from the Army's decision to do so by delivery order. The court rejected the protestor's argument on two grounds. First, the court held that "[a]n agency's underlying decision to procure goods or services without competition through a delivery order has a direct and causal relationship to the 'issuance' or 'proposed issuance' of the delivery order that the agency ultimately utilizes to effectuate the procurement." *Id.* at 756. Second, the court held that "[a]ll actions that predate the 'issuance' of the delivery order" are in connection

with the delivery order, including the Army's decision to conduct a noncompetitive sole-source procurement via a delivery order. *Id.* at 757-58. Here, like protestor in *DataMill, Inc.*, Akira frames its protest as a challenge to the government's decision to make a noncompetitive sole source award to C-HIT for migration services. *See, e.g.*, Pl.'s Mot. at 14 (ECF No. 31). However, as the court found in *DataMill, Inc.*, Akira is actually protesting the government's decision to conduct a noncompetitive sole-source procurement *via task order modification*, which is barred by FASA because that protest is "in connection with" the "issuance" of a task order.

Similarly, in *Nexagen Networks, Inc. v. United States*, 124 Fed. Cl. 645, 648-49 (2015), the protestor challenged the Army's decision to take corrective action by reevaluating a task order awarded to the protester, demanding the protestor meet additional requirements not in the task order, cancelling a task order awarded to the protestor, and resoliciting the cancelled work. The court held that each of these arguments were barred by FASA and did not fall under any of FASA's exceptions. *Id.* at 653-64. And in *Mission Essential Personnel, LLC v. United States*, 104 Fed. Cl. 170, 179 (2012), the protestor challenged the Army's decision to take corrective action by "setting aside portions of the original task orders and recompeting those parts." The court there found that this court's review of the challenged corrective action to compete a new task order was barred by FASA. *Id.* at 178. Specifically, the court held that the "protest of the Army's corrective action relates to, and is connected with, the issuance of a task order" because the "corrective action was the direct and immediate cause of the recent issuance"

of another task order, and because "the corrective action was a direct response to perceived shortcomings of the original two task orders." *Id.* at 178-79.

Although the above cases do not explicitly address task order "modifications," they all demonstrate that FASA bars protests over procurement decisions connected to the issuance of task or delivery orders, including decisions about the assignment of services to certain contractors or decisions related to whether those services would be subject to competition or noncompetitive sole sourcing. Consistent with this precedent, the court finds that Akira's challenge to CMS' decision to sole source the migration work required in the IDIQ contract to C-HIT through a task order modification is a protest in connection with the issuance of a task order and thus falls within FASA's protest bar.[6] Therefore, the court **GRANTS** the government's motion to dismiss.[7]

## CONCLUSION

---

[6] As discussed above, it is well-settled that the court's review in protests is limited to the administrative record before the agency unless supplementing the record is needed for effective judicial review. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)). After careful review, the court finds that neither Akira's nor the government's motions to supplement the administrative record contain information necessary for effective judicial review. Both motions seek to supplement the administrative record with documents allegedly relevant to the merits of Akira's protest. The court has determined that it does not have jurisdiction over the protest; therefore, additional documents relating to the merits of the protest are not necessary for effective judicial review.

[7] The government also argues in its motion to dismiss that Akira does not have standing as an interested party because CMS had determined that Akira "is incapable of successfully performing the migration work that was required by the migration task order" when CMS decided not to exercise the option years o Akira's task order. *See* Def.'s Supp. Brief at 13 (ECF No. 39). Because the court does not have jurisdiction over this task order protest under FASA, the court has no occasion to reach this alternative jurisdictional argument.

For the foregoing reasons, the government's motion to dismiss Akira's complaint in its entirety for lack of subject matter jurisdiction is **GRANTED**. Akira's and the government's motions to supplement the administrative record, the parties' cross-motions for judgment on the administrative record, and Akira's motion for a preliminary injunction are **DENIED-AS-MOOT**. Akira's complaint is dismissed without prejudice. The Clerk is directed to enter judgment accordingly.

   **IT IS SO ORDERED.**

           s/Nancy B. Firestone  
           NANCY B. FIRESTONE
           Senior Judge